**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BRIAN SIDNEY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 16 C 2041** |
| **vs.** | ) | |
| | ) | |
| **LUIS ALEJO, et al.,** | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Brian Sidney has sued Chicago police officers Kevin Osborn and Alfonso

Herrera, the City of Chicago, Robert Morris University Illinois (RMU), and Luis Alejo, a

Chicago police officer who also works as a private security guard for RMU.  Following

previous dismissals, Sidney has the following claims remaining:  a claim against

Osborn, Herrera, and Alejo under 42 U.S.C. § 1983 for false arrest; a state law

malicious prosecution claim against Alejo and RMU; and a state law claim for intentional

infliction of emotional distress against Alejo and against RMU.  Sidney also asserts a

claim against the City of Chicago under 745 Ill. Comp. Stat. 10/9-102 for indemnification

of Osborn and Herrera.  The defendants have moved for summary judgment on the

remaining claims.

**Background**

RMU is a not-for-profit educational institution.  Sidney graduated from RMU in

1987, and he used the library frequently as an alumnus.  On June 25, 2014, Sidney

arrived at the RMU library between 6:00 p.m. and 7:00 p.m. and lawfully accessed the

library using his alumni identification card.

The RMU library and restrooms close at 10:00 p.m. Sidney left the library at 9:35 p.m. and stopped to use the men's restroom on his way out. While Sidney was in the restroom, someone knocked on the door and told him he needed to leave. Sidney answered that he would be out in a few minutes. About two minutes later, someone returned, knocked on the door, and again told Sidney he needed to leave.

When Sidney left the restroom, he approached a man in the hallway and asked if he had knocked on the restroom door. The man—RMU security guard Matthew Nomellini—told Sidney that he had not but that he would call the person who had. Nomellini then called Alejo, who was working that night as an RMU security guard. Alejo says he observed Sidney acting aggressively toward Nomellini. Sidney denies this. Sidney asked Alejo if he had been knocking on the restroom door, saying, "The reason I'm asking you is because I am just inquiring is there something I need to know? Is something going on?" RMU's Mot. for Summ. J., Ex. B at 99:5-12. Sidney and Alejo exchanged words about bathroom closing procedures and disagreed about when closing procedures begin.

At some point during this discussion, Sidney told Alejo he was an RMU alumnus, and Alejo asked Sidney for his identification card. Sidney removed a stack of cards from his wallet and began going through them. When Alejo saw Sidney's alumni identification card, he reached out and took it. Alejo then told Sidney that he was revoking his alumni privileges and told him how to retrieve his alumni identification card at a later date. The parties agree that Alejo told Sidney, several times, that he had to leave the premises, and that if he did not, he would be arrested. *See* Pl.'s Resp. to RMU's LR 56.1 Stat. ¶¶ 31-32. The parties dispute whether Alejo, in his capacity as an

RMU security guard, had the authority to revoke Sidney's alumni privileges.[1]  They also dispute whether Sidney knew that Alejo was an RMU security guard.  Sidney says he initially assumed this but that he began to doubt it when Alejo grabbed his identification card.

Sidney asked Alejo why he took his identification card, and Alejo replied, "I can do that. . . . I'm the police."  *Id.* ¶ 30.  Sidney says he asked for proof but that Alejo would not show him any form of identification.

Alejo then radioed the lobby security guards and asked them to call the Chicago police.  Sidney agrees this happened but says that *he* asked Alejo to call the police so that he could verify Alejo's identity.  There was also a verbal exchange between Alejo and Sidney.  According to Sidney, Alejo told Sidney he was acting like a fifteen-year-old.  Sidney admits that he called Alejo a clown and Nomellini an idiot.

Sidney, Alejo, Nomellini, and Nicole Mayoski, another security guard, went to the lobby to wait for the police.  Eventually officers Osborn and Herrera arrived.  Sidney says that he told Osborn, "I had to stay on the premises" because Alejo had "snatched my I.D. out of my hand, stating he was a police officer.  I asked him for identification to verify that.  He refused to give it to me, so I asked him to call the police."  RMU's Mot. for Summ. J., Ex. B at 179:16-180:5.  In the officers' presence, Alejo repeated his last name but did not provide additional identification information.  Osborn then said to Sidney, "You have his name.  Now get your things and just take it over with the

---

[1] With their reply, Alejo and RMU submitted an affidavit from RMU Provost Mablene Krueger addressing this point.  Because Alejo and RMU submitted this affidavit for the first time on reply, the Court will not consider it.  *See, e.g.*, *Rosario v. City of Chicago*, No. 11 C 456, 2012 WL 1319806, at *5 (N.D. Ill. Apr. 17, 2012) (defense raised for the first time in a reply brief is waived).

administration tomorrow."  Pl.'s Stat. of Add'l Facts ¶ 27.  Sidney and Osborn then walked toward the lobby exit, they exchanged pleasantries, and Sidney walked outside toward the bus stop.

As Sidney was leaving, he "looked back and saw Alejo standing next to Officer Osborn, and Alejo was moving his finger back and forth while pointing at Osborn's chest as if Alejo was berating Osborn."  *Id.* ¶ 29.  About fifteen seconds after Sidney left the building, Osborn and Herrera came outside, motioned for Sidney to come toward them, and arrested him.

 Osborn says that Alejo told him that he wanted to sign a complaint charging Sidney with trespassing.  Alejo testified that he was "adamant" that he wanted to sign the complaint, RMU's Mot. for Summ. J., Ex. A at 78:24-79:2, and Sidney does not dispute this fact.  Arthur Gould, a security guard in the lobby, testified that after Sidney left the building, he observed Alejo having an "animated" conversation with one of the officers.  Pl.'s Mem. in Opp. to RMU's Mot. for Summ. J., Ex. 5 at 22:21-23:13.  Gould testified that the officer told Alejo that "he couldn't arrest Mr. Sidney because he was an alumni, you know, he had ID."  *Id.* at 23:14-24:4.  Gould also testified that he heard Osborn ask Alejo, "Are you sure you want me to arrest him for trespassing?"  *Id.* at 24:24-25:8.  Similarly, lobby security guard Ernest Parks testified that after Sidney left the building, he heard Alejo tell one of the officers that he "wanted [Sidney] arrested for trespassing" and that Alejo repeated this after the officer asked Alejo if he was sure.  Pl.'s Mem. in Opp. to RMU's Mot. for Summ. J., Ex. 6 at 20:13-21:7, 55:8-17.

After Osborn and Herrera arrested Sidney, they transported him to a police station, where he was held for approximately five hours.  At some point, Alejo signed, as

an "Agent for RMU," a misdemeanor complaint for criminal trespass to real property. Pl.'s Mem. in Opp. to RMU's Mot. for Summ. J., Ex. 7. Sidney contends that Alejo did not sign the complaint until after the officers had arrested him. The signed complaint contains pre-printed language stating that Sidney "[d]id knowingly enter/remain upon the land/building of Robert Morris University . . . after receiving, prior to such entry, notice from RMU Security that such entry was forbidden." *Id.* The complaint cites 720 Ill. Comp. Stat. 5/21-3(a)(1). Section 21-3(a) states: "A person commits criminal trespass to real property when he or she: (1) knowingly and without lawful authority enters or remains within or on a building; (2) enters upon the land of another, after receiving, prior to the entry, notice from the owner or occupant that the entry is forbidden; (3) remains upon the land of another, after receiving notice from the owner or occupant to depart."

Sidney went to trial on the trespassing charge. Alejo testified as the prosecution's only witness. On February 7, 2015, a judge found Sidney not guilty after a bench trial.

Sidney argues that as a result of these events, he has experienced mental suffering, including feelings of humiliation, anxiety, depression, and fear. For example, he feels anxious around the police and fears for the safety of his African-American son. According to Sidney, he lost approximately ten pounds between his arrest and his criminal trial, and he has experienced sleep loss and lethargy. He concedes that he has not sought medical treatment.

## Discussion

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court does not weigh evidence or determine the credibility of testimony that is properly considered. *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). [2]

## 1.  Fourth Amendment claim (Count 1)

### a.  Alejo

In count one of his amended complaint, Sidney alleges that Osborn and Herrera violated his constitutional rights by arresting him for criminal trespass without probable cause and that they conspired with Alejo to do so. Alejo can be liable on Sidney's section 1983 claim only if he acted under color of state law in connection with Sidney's arrest. *See Wilson v. Warren Cty.*, 830 F.3d 464, 468 (7th Cir. 2016). No reasonable jury could so find. Alejo's actions that caused Sidney's arrest—specifically, his request to the police to arrest Sidney, and his swearing out of the complaint—were taken in the course of his employment as a security guard for RMU, not as a Chicago police officer. Sidney testified that Alejo invoked his police authority when explaining why he had taken Sidney's identification card, but that is not what Sidney's Fourth Amendment claim

---

[2] Osborn and Herrera moved to strike certain responses in Sidney's Local Rule 56.1(b) Statement of Facts, and asked the Court to deem Osborn and Herrera's Local Rule 56.1(a) Statement of Facts admitted. Similarly, Sidney moved to strike certain paragraphs from Osborn and Herrera's Local Rule 56.1(a) Statement of Facts. The Court denies these motions.

involves. Alejo sought Sidney's arrest, and he swore out the complaint that served as the basis for the charge against Sidney, as an agent of RMU.

Sidney's sole argument in support of the proposition that Alejo acted under color of state law is that Alejo conspired with Osborn and Herrera to cause the arrest. *See* Pl.'s Mem. in Opp. to RMU's Mot. for Summ. J. at 11. "For a private actor to act under color of state law he must have had a meeting of the minds and thus reached an understanding with a state actor to deny plaintiff[ ] a constitutional right." *Wilson*, 830 F.3d at 468 (internal quotation marks omitted). No reasonable jury could find such a conspiracy on the record before the Court. At most, the evidence would permit a finding that Alejo importuned Osborn and Herrera, who were initially reluctant or resistant, and that they acquiesced. Sidney cites no authority suggesting that this gives rise to a viable claim that there was a conspiracy to deprive him of his constitutional rights.

Even if Alejo gave the officers false information, "[l]ying to a state actor in order to induce him to participate in unlawful conduct . . . is the type of unilateral action that does not create private actor liability." *Wilson*, 830 F.3d at 469; *see also id.* (collecting cases in which courts denied private actor liability for causing arrests through false accusations, where there was no evidence that "the arresting officers shared a common goal of violating plaintiff's" constitutional rights, or where there was no evidence that the officers knew the accusations were false); *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1352 (7th Cir. 1985) ("[P]roviding false information to an arresting officer is not, by itself, sufficient to state a claim against that private party under § 1983.").

For these reasons, Alejo is entitled to summary judgment on count 1 on the basis

that no reasonable jury could find that he acted under color of state law.[3]

### b. Osborn and Herrera

Osborn and Herrera argue that they are entitled to summary judgment because there was probable cause to believe that Sidney had committed a criminal offense. "The existence of probable cause to arrest a suspect for any offense, even one that was not identified by the officers on the scene or in the charging documents, will defeat a Fourth Amendment false-arrest claim." *Sroga v. Weiglen*, 649 F.3d 604, 608 (7th Cir. 2011) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153-54 (2004)). A police officer has probable cause to arrest an individual when the facts and circumstances of which he has knowledge "reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). The determination of probable cause is made on an objective basis. *Id.* Specifically, rather than consider an officer's subjective reason for making the arrest, a court considers the conclusions that the officer could reasonably have drawn given the information he knew at the time. *Id.* When a police officer is deciding whether to arrest someone based on conduct he did not witness, he "may rely on information provided to him by . . . an eyewitness to the crime that the officer reasonably believes is telling the truth." *Id.* at 680; *see also Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986) ("In Illinois the report of an eyewitness to a crime is sufficient to authorize an arrest.").

Osborn and Herrera did not have probable cause for the particular criminal

---

[3] Alejo did not argue in his opening brief that he had probable cause and thus forfeited the right to seek summary judgment on that basis.

trespass charge in Alejo's signed complaint, which alleged that Sidney knowingly remained on RMU's premises "after receiving, *prior to such entry*, notice from RMU security that such entry was forbidden."  Pl.'s Opp. to RMU's Mot. for Summ. J., Ex. 7. Osborn testified that Sidney told him he had a right to be in the library as a student, and Sidney testified that he told Osborn his version of the events, including that Alejo had taken his alumni identification card.  There is no evidence that Alejo gave the officers any contrary information.  In light of the information that Osborn had at the time, no reasonable jury could find that he reasonably believed that Sidney received notice prior to entering RMU that his entry was forbidden.

That said, no reasonable jury could find that Osborn and Herrera *lacked* probable cause to arrest Sidney for a different criminal trespass offense:  "remain[ing] upon the land of [RMU], after receiving notice from the owner or occupant to depart."  720 Ill. Comp. Stat. 5/21-3(a)(3).  Sidney specifically concedes that he was told by Alejo, an agent of RMU, to leave the property, and it is equally undisputed that Sidney did not leave, at least as of the time that the officers arrived.  Sidney contends that he had a good reason to stay, but that is of no consequence; a police officer is not required to investigate asserted defenses, at least if the statutory elements of the applicable statute are met.  *See, e.g.*, *Jackson v. City of Peoria*, 825 F.3d 328, 330 (7th Cir. 2016) (rejecting plaintiff's argument that "the police are culpable for failing to investigate his alibi before arresting him" because there was probable cause for the arrest and police "may . . . leave to the judicial process the question whether a defense applies").

Sidney's arguments supporting his contention that Osborn and Herrera are not entitled to summary judgment are all unavailing.  First, Sidney acknowledges that if an

agent of RMU, acting within the scope of his authority, terminates a person's alumni privileges and "that person, knowing that his privilege . . . has been terminated by an agent," remains in the building, "that person would be guilty of criminal trespass to real property."  Pl.'s Mem. in Opp. to Osborn/Herrera Mot. for Summ. J. at 10-11.  Sidney argues, however, that terminating a person's alumni privileges is not within the scope of an RMU security guard's authority, and that as a result, "[t]here was no reason to believe that Sidney was trespassing."  *Id.* at 11.  But that does not change the outcome.  For one thing, Sidney has offered no evidence that Osborn and Herrera were aware at the time they arrested him that an RMU security guard might lack authority to revoke Sidney's alumni privileges.  For another, the case law suggests that police officers can act on criminal trespass complaints from security guards or employees without verifying whether they are legally authorized to order patrons to leave the premises.  *See, e.g.*, *Kampinen v. Individuals of Chicago Police Dep't*, No. 00 C 5867, 2003 WL 21982158, at *3, *5-6 (N.D. Ill. Aug. 19, 2003) (police officers had probable cause to arrest plaintiff where an "employee in the Security Department" of the Merc Club "had authorized that a criminal trespass complaint be issued against" plaintiff), *aff'd sub nom. Kampinen v. Martinez*, 102 F. App'x 492, 496-97 (7th Cir. 2004) (officer and special agent had probable cause to arrest plaintiff for criminal trespass "given the criminal complaint initiated by a Mercantile Exchange employee who reported that [plaintiff] was found in a restricted area and had refused to leave when asked"); *Carr v. City of Chicago*, No. 85 C 8322, 1990 WL 103650, at *1-2 (N.D. Ill. June 29, 1990) (police officer had probable cause to arrest plaintiff where a security guard for the Chicago Public Library called the police, told the police that plaintiff "had assaulted him and had refused to leave the

library when ordered to do so," and had signed criminal assault and trespass complaints against plaintiff).

Second, Sidney argues that he told Osborn and Herrera he was unsure whether Alejo was an RMU security guard; that "Alejo did not dispute to officers Osborn or Herrera that he had refused to show his identification to Sidney;" and that under these circumstances, the officers could not have reasonably believed that Sidney knowingly committed criminal trespass. Pl.'s Mem. in Opp. to Osborn/Herrera Mot. for Summ. J. at 12. Sidney correctly points out that the "'knowingly' mental state applies to all elements of the offense." *Id.* at 11 (quoting *People v. Chai*, 2014 IL App (2d) 121234 ¶ 34). But "[t]he relevant probable cause inquiry on the question of notice is whether a reasonable [officer] in [Osborn and Herrera's] position . . . had reasonable grounds to believe that [Sidney] received the notice, not whether [Sidney] believed such notice had been given." *United States v. Kincaid*, 212 F.3d 1025, 1029 (7th Cir. 2000). Sidney admits that Alejo and Nomellini were present while he was speaking with Osborn and that they were wearing matching slacks and blazers. A reasonable officer could conclude that Sidney understood they worked for RMU based on their apparel. "[T]o form a belief of probable cause," Osborn and Herrera were "not required . . . to act as a judge or jury to determine whether [Sidney's] conduct satisfie[d] all of the essential elements of" the criminal trespass statute, including the notice element. *Sroga*, 649 F.3d at 610 (internal quotation marks and citation omitted). Osborn and Herrera had reasonable grounds to believe that Sidney knew Alejo was an RMU security guard and thus that he received adequate notice to leave the premises. No reasonable jury could conclude otherwise.

Sidney makes a related argument that when it is unclear whether a suspect has

committed a crime, an officer may not arrest him before pursuing "[r]easonable avenues of investigation" to determine what happened.  Pl.'s Mem. in Opp. to Osborn/Herrera Mot. for Summ. J. at 12 (quoting *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)). But Osborn did this by speaking with both Sidney and Alejo before Sidney's arrest. Osborn and Herrera "h[ad] no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause ha[d] been established via the accusation of a credible witness."  *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006).

Finally, Sidney argues that Alejo's signed complaint does not establish probable cause because there is a genuine dispute regarding when Alejo signed it.  But because the officers had probable cause to arrest Alejo for criminal trespass based on what they were told, this dispute is of no consequence.  *See, e.g.*, *Gramenos*, 797 F.2d at 434 ("No principle of federal law makes a properly attested complaint necessary to an arrest or a criminal prosecution.  Police often arrest suspects on the basis of oral reports from witnesses.").

For these reasons, Osborn and Herrera are entitled to summary judgment on Sidney's false arrest claim.

## 2.    Malicious prosecution claim (Count 3)

In count three of his amended complaint, Sidney asserts a claim against Alejo for malicious prosecution, arising from the criminal trespass charge initiated by Alejo's signed complaint.  Sidney also asserts the claim against RMU via the doctrine of *respondeat superior*.

To recover for malicious prosecution, Sidney must establish five elements:  "(1)

commencement of criminal proceedings by the defendant[]; (2) termination of that matter in favor of [Sidney]; (3) the absence of probable cause for the proceedings; (4) the presence of malice; and (5) resulting damages." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013); *see also Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238, 1242 (1996). The parties do not dispute that the proceeding was terminated in Sidney's favor, so the Court does not address that requirement.

To commence or continue a proceeding in Illinois, "the defendant must have initiated the criminal proceeding or 'his participation in it must have been of so active and positive a character as to amount to advice and cooperation.'" *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 922 (7th Cir. 2001) (quoting *Denton v. Allstate Ins. Co.*, 152 Ill. App. 3d 578, 583, 504 N.E.2d 756, 760 (1986)). "Normally, a private citizen institutes a criminal judicial proceeding by filing a complaint." *Id.Logan*, 246 F.3d at 922.

Alejo contends that he did not commence the criminal proceeding against Sidney. This argument is frivolous. Alejo signed the complaint, without which there would have been no criminal case to begin with. Even before that, there is evidence that he importuned Osborn and Herrera to arrest Sidney for trespass, as the Court has discussed. Alejo's contention that he did not use improper influence or make knowing misstatements are beside the point for purposes of the "commencement or continuation" requirement.

Alejo next argues that he is entitled to summary judgment because there was probable cause for Sidney's arrest. "In a malicious-prosecution case, probable cause is defined as 'a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the

13

offense charged.'" *Williams*, 733 F.3d at 759 (quoting *Gauger v. Hendle*, 2011 IL App (2d) 100316 ¶ 112)). Unlike Sidney's Fourth Amendment claim, probable cause for purposes of a malicious prosecution claim is charge-specific. *See Holmes*, 511 F.3d at 682 ("[P]robable cause as to one charge will not bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking."); *see also Williams*, 733 F.3d at 759 ("Malicious prosecution is offense-specific[.]").

Alejo's complaint charged Sidney with criminal trespass on the basis that Sidney remained on RMU's premises "after receiving, prior to such entry, notice from RMU Security that such entry was forbidden." Alejo lacked probable cause to accuse Sidney of this offense; there is no evidence at all that Sidney was given notice before entering the library that entry was forbidden. Alejo argues that "a mistake or error that is not grossly negligent will not affect the question of probable cause in an action for malicious prosecution where there is an honest belief by the complainant that the accused is probably guilty of the offense." *Johnson v. Target Stores, Inc.*, 341 Ill.App.3d 56, 72, 791 N.E.2d 1206, 1219 (2003). But he makes no attempt to argue why the Court should find that the mistake was "not grossly negligent," nor does he attempt to argue how he could have held an "honest belief" that Sidney committed this particular offense. And because probable cause on a claim for malicious prosecution is charge-specific, the fact that Alejo *could have* charged Sidney with trespass under a different subparagraph of section 21-3 is of no consequence in determining liability for malicious prosecution. Because it is undisputed that Alejo knew that Sidney used his alumni identification card to enter the RMU library, a reasonable jury could find that he did not have an "honest and sound suspicion" that Sidney "committed the offense charged."

14

*Williams*, 733 F.3d at 759.

Next is the question of malice.  A plaintiff can demonstrate that a defendant acted with malice "by showing that the [defendant] proceeded with the prosecution for the purpose of injuring plaintiff or for some other improper motive."  *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 97, 887 N.E.2d 656, 663 (2008); *see also Williams*, 733 F.3d at 759 ("'Malice' in the context of malicious prosecution means that the officer who initiated the prosecution had any motive other than that of bringing a guilty party to justice." (internal quotation marks and citation omitted).  "It is well established that a jury can infer malice from an absence of probable cause."  *Williams*, 733 F.3d at 760 (citing *Aguirre*, 382 Ill. App. 3d at 97, 887 N.E.2d at 663).  Alejo argues that no reasonable jury could find he acted with malice.  He emphasizes that he and Sidney had not interacted prior to the incident, and he allegedly gave Sidney a chance to leave the premises before his arrest.  But the question of motive is genuinely disputed.  For example, Sidney argues that Alejo treated him in a humiliating manner, including by forcing him to leave the restroom before the library closed, grabbing his alumni identification card despite his cooperation, saying that he was acting like a fifteen-year-old, and refusing to give Sidney the information he requested.  Because there is evidence that probable cause was lacking for the specific offense underlying Sidney's prosecution, and because there is contested evidence regarding Alejo's motive for setting the prosecution in motion, summary judgment on Sidney's malicious prosecution claim is inappropriate.

Finally, Alejo asserts that Sidney cannot establish damages because he does not claim that he lost wages or that he was forced to pay legal fees for his criminal case.  "[I]f the malicious prosecution is based on the institution of criminal proceedings,"

however, "no showing of special injury is required." *Voga v. Nelson*, 115 Ill. App. 3d 679, 682, 450 N.E.2d 1364, 1367 (1983); *see also Barnett v. Baker*, 2017 IL App (1st) 152443-U ¶ 36. Because Sidney's malicious prosecution claim is based on the institution of criminal proceedings, he need not show that he suffered a special injury. Moreover, as Sidney points out, an arrest can be considered a special injury in a civil case. *See, e.g.*, *Voga*, 115 Ill. App. 3d at 682, 450 N.E.2d at 1367.

For these reasons, Alejo and RMU are not entitled to summary judgment on Sidney's malicious prosecution claim.

### 3. Intentional infliction of emotional distress (Count 4)

"An intentional infliction of emotional distress claim under Illinois law requires proof of three elements: 'First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.'" *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016) (quoting *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 269, 798 N.E.2d 75, 80 (2003)). For conduct to be considered extreme and outrageous, it must "go beyond all bounds of decency and be considered intolerable in a civilized community." *Cairel*, 821 F.3d at 835 (internal quotation marks and citation omitted). "The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous." *McGrath v. Fahey*, 126 Ill. 2d 78, 86-87, 533 N.E.2d 806, 809 (1988). Some Illinois courts have held, however, that simply making a false complaint to the police and thereby causing a plaintiff's arrest does not constitute extreme and outrageous

conduct—at . *See, e.g.*, *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 450, 828 N.E.2d 323, 335-36 (2005) (collecting cases). Additionally, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not qualify as extreme and outrageous conduct. *Cairel*, 821 F.3d at 835 (quoting *McGrath*, 126 Ill. 2d at 86, 533 N.E.2d at 809)..

Sidney alleges that Alejo's conduct was extreme and outrageous because he "snatched Sidney's alumni ID out of [his] hand, purported to revoke Sidney's alumni ID, refused to return the ID to him, told Sidney he would be arrested if he did not leave the building without his alumni ID, refused to show Sidney his . . . identification, and then had him falsely charged . . . after Sidney had done nothing to provoke such conduct other than questioning Alejo's statement that they usually close the bathrooms . . . at 9:30 p.m." Pl.'s Mem. in Opp. to RMU's Mot. for Summ. J. at 14. Sidney also suggests that Alejo abused his police powers and might have mistreated Sidney because he is African-American; Alejo denies this.

No reasonable jury could conclude that Alejo's conduct was extreme and outrageous as Illinois courts use that term. Sidney, for example, insists that he asked Alejo to call the police, admits that he waited for the police to arrive, and admits that Alejo did not restrain him while he waited. Although Sidney makes a claim of race-based discrimination, the only evidence he cites is Alejo's statement that he was acting like a fifteen-year-old. Inferring race discrimination from this requires too much of an inferential leap. And although Alejo's allegedly false complaint caused Sidney's arrest and prosecution, that alone is insufficient to prove extreme and outrageous conduct. *See, e.g.*, *Schiller*, 357 Ill. App. 3d at 450, 828 N.E.2d at 335-36; *Adams*, 292 Ill. App.

3d at 39, 684 N.E.2d at 942.  Finally, *Miller v. Washington*, No. 11 C 1520, 2013 WL 1340590 (N.D. Ill. Mar. 30, 2013), which Sidney cites to support his claim that Alejo's conduct was extreme and outrageous, is distinguishable.  In *Miller*, there was evidence that the defendants kicked a disabled plaintiff out of the home in which he had permissibly lived for sixteen years.  *Id.* at *8.  The homeowner had allegedly promised Miller that he could stay there, but the defendants had Miller falsely arrested and charged for criminal trespass in order "to garner control over [the homeowner's] finances."  *Id.*  For the reasons already discussed, and because temporarily losing one's library privileges can scarcely be compared with losing one's home, Sidney's evidence of extreme and outrageous conduct is significantly weaker.

Finally, no reasonable jury could conclude that Alejo's conduct caused Sidney to suffer the type of severe emotional distress required to sustain a claim.  In Illinois, "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it."  *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 314-15 (7th Cir. 2017) (quoting *McGrath*, 126 Ill. 2d at 85, 533 N.E.2d at 809).  Physical injury is not required to establish severe emotional distress, nor is the need to seek medical treatment.  *Honaker v. Smith*, 256 F.3d 477, 496 (7th Cir. 2001).  But mere annoyance, frustration, stress, embarrassment, humiliation, nervousness, and the like are insufficient.  *Id.* at 495-96.

The degree of emotional distress that Sidney contends he has suffered is insufficient sustain a claim.  And although he additionally argues that the police held him in jail for five hours and that he lost ten pounds between his arrest and his criminal trial, such suffering is not "so severe that no reasonable man could be expected to endure it."

*McGreal*, 850 F.3d at 314-15.  Finally, Illinois courts "tend[] to merge the issue of outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress, in effect requiring more evidence of outrageousness the weaker the evidence of distress."  *Honaker*, 256 F.3d at 496.  Because Sidney's case is weak on both outrageousness and on extreme distress, no reasonable jury could find in his favor.  Alejo and RMU are entitled to summary judgment on Sidney's claim for intentional infliction of emotional distress.

### Conclusion

For the foregoing reasons, the Court grants Osborn and Herrera's motion for summary judgment [dkt. no. 65], grants Alejo's motion for summary judgment on counts one and four, and denies Alejo and RMU's motion for summary judgment on count three [dkt. no. 57].  The case is set for a status hearing on August 9, 2018 at 8:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 1, 2018